WALDEN and WALDEN *against* SHERBURNE and EAKIN.

WALDEN
v.
SHERBURNE.

THIS was an action of *assumpsit* for goods sold and delivered, money had and received, money paid, and money lent and advanced. The defendant, *Sherburne*, alone, was taken and appeared. The cause was tried before Mr. J. *Platt*, at the *New-York* sittings, in *November*, 1817.

It was admitted, that on and before the 29th *September*, 1806, the defendants were partners transacting business at *Nantes*, in *France* ; and that on the 30th of *September*, they entered into the following agreement :

" We, the undesigned, *Samuel Sherburne* and *Samuel Hunter Eakin*, both natives of the *United States* of *America*, having established a house of commerce at the city of *Nantes*, in *France*, on the 21st day of *May*, 1804, under the firm of *Sherburne & Eakin*, and now, for the purpose of promoting the general as well as individual interest of each party, having found it expedient to establish a commercial house in *New-York*, we have unanimously agreed to dissolve our

*A.* and *B.* citizens of the *United States*, having been in partnership in *France*, agreed, in *September*, 1806, to dissolve that partnership, and that *B.* should establish himself in *New-York*, *A.* remaining in *France*; that they should exert themselves to procure consignments from the *United States*; that *A.* should ship, goods to *B.*, the amount of which, and such sum as *B.* could procure by association, loan, or credit, were to be converted into reasonable advances on goods consigned to *A.*; that on shipments made by *A.* to the *United States*, by order of *B.*, *B.* should receive one third of the profits, and on shipments by *B.* to *France*, *A.* should receive one third of the profits, and that *B.* should have one third of the commissions on consignments from the *United States* to *A.*; that a statement of their respective accounts was to be made at the end of each year, and that if one of the parties had incurred losses, that the other was not to be answerable for them, beyond a forfeiture of the profits of the year. According to this agreement, *B.* established himself as a merchant in *New-York*, and having contracted debts in relation to his business : Held, in an action against *A.* and *B.*, that by this agreement they were partners, there being a community of profit and loss ; that as the debt, being principally for money lent, had relation to the partnership concerns, the plaintiff was entitled to recover ; and that it was not necessary for him to show that the money lent or credit given was used for the benefit of the partnership; and that the stipulation limiting the extent of the liability of each of the partners for losses incurred by the other, although valid between themselves, could not affect other persons.

Where one of two partners executes a bond for duties on goods imported, with a surety, and the surety advances his co-obligor money with which he pays the bond, he may maintain an action against both the partners for the money lent, this being a partnership transaction ; although had the surety himself taken up the bond, he could only have brought an action for money paid, against the partner who executed it.

An admission by one partner, after dissolution of the partnership, of a balance due from the firm, does not bind the firm ; but entries made by one of the partners, during the partnership, in a book of accounts, are admissible evidence against both.

If a party in a cause to substantiate a credit in his own favour, produce an account made out by the opposite party, he renders it evidence against himself in the first instance; but he is still at liberty to disprove the charges in the account.

Interest is due on a balance of account from the time it is liquidated; and it is to be considered as liquidated when rendered, if no objections be made to it. When a verdict is taken subject to the opinion of the court, the court may draw the same conclusions from the evidence, as the jury ought to have done.

NEW-YORK,
October, 1818.

WALDEN
v.
SHERBURNE.

foregoing partnership, at this place, on this present day, and that our future concerns shall be conducted on the following terms and conditions, viz.

" 1. The principal objects of our respective establishments tending towards procuring consignments on commission from the *United States*, we hereby pledge ourselves and honour to use our best endeavours and exertions in the attainment of this object.

" 2. In order to facilitate the better its execution, the said *Sherburne* engages to ship, from time to time, such goods as may be deemed suitable for sale in the *United States*, directed to the said *Eakin*, for account of himself, for such *American* citizens as he may point out.

" 3. The said *Eakin* engages to convert all such amounts, likewise any sum he may be able to command, arising from association, loan, or credit, into reasonable advances on goods consigned for sale to the house of the said *Sherburne* : the said *Eakin* taking the needful precaution of causing insurance to be effected thereon.

" 4. All shipments of goods made by order of said *Eakin*, and to his address in the *United States*, shall be for his account and risque ; but it is hereby agreed, that one third of the nett proceeds arising from the sales of said goods, (if any there are,) after deducting two and a half per cent. commission, shall be carried to the credit of said *Sherburne's* account.

" 5. On all consignments of goods received from the *United States*, whether arising from shipments made directly to the said *Eakin*, or from his friends, in consequence of his influence, and exertions, or orders, the said *Sherburne* hereby agrees to account with the said *Eakin* for one third of the nett commissions arising from such consignments : and it is further understood, that the present conditions shall be made reciprocal.

" 6. When shipments of goods are deemed prudent to be made by the said *Eakin*, on his own acconnt, consigned to the said *Sherburne*, it is hereby agreed that the present voluntary and mutual exchange is to take place.

" The said *Sherburne* shall receive one-third of the nett

profits, when any there are, on such adventures, and the said *Eakin* one-third of the nett commission arising therefrom, for each of which the respective accounts of the parties shall be credited; and in order that no misunderstanding, or discussion, may take place on this head, it is expressly agreed and obligatory on both parties, that on the 31st day of *December*, in every year, a letter should be written, copied, and addressed to each other, announcing the sum for which the respective accounts are credited, for such share of profits or commissions gained during the year. It is furthermore agreed on between the parties, that the foregoing arrangement, as regards a repartition of profits and commissions, is assimilated to the principles of a *commandite*, that is to say, if any losses should arise on such adventures, they shall be deducted from the account of profits made in the year; and in case they should exceed these last, no further responsibility can be laid on the said *Sherburne* than the forfeit of profits made; and, in like manner, if any losses should happen to the said *Sherburne*, in consequence of such consignments received, either by guaranty, or any other direct cause, then the said *Eakin* only to be liable to contribute thereto for as much as may be due him arising from the same species of profits made in the year, the result of all which shall be respectively made known at the end of each year as aforesaid.

" 7. The accounts concerning adventures per *Julia Ann* and *Franklin* being the only remaining to settle, the said *Eakin* engages to settle the same in the *United States*, and in case of a loss thereon, (which we have no reason to expect,) it shall be deducted from the gross amount of first profits, arising from our future concerns.

" 8. All other accounts existing between the contracting parties, being settled and acknowledged this day, and the present instrument being specially to regulate our future concerns, we have signed it double to this effect, at *Nantes*, *September 30th*, 1806."

The plaintiffs produced and proved an account current between them and *Eakin*, on which there was the following endorsement, in the hand writing of, and subscribed by *Eakin*: " I do hereby certify the foregoing to be a true ac-

count with Messrs. *Jacob* and *Thomas Walden* and myself, and that there is a balance due them of five thousand eight hundred and two dollars, fifty-four cents, and which has been contracted since my connection with *Samuel Sher-burne* of *Nantes*. *New-York, September* 15, 1808." It was admitted, that after the foregoing agreement between the defendants was entered into, *Sherburne* continued at *Nantes*, and transacted general business in his own name, and *Eakin* removed to *New-York*, and conducted business in his own name. In order further to establish the existence of a partnership between the defendants, the plaintiffs produced in evidence, *Sherburne's* account current with *Eakin*, and a number of letters from *Sherburne* to *Eakin*, during the years 1807 and 1808, the period during which they were contended to be in partnership, in which letters, the agreement of *September* 30, 1806, is frequently referred to and recognized : but as the court did not consider these letters, or those of *Eakin* in answer to them, as of any material importance, it is thought unnecessary to state their contents, except that in a letter from *Sherburne* to *Eakin*, dated *Nantes*, 30th of *May*, 1808, he says :

" I have received your several letters, &c. Their contents treat generally on the subjects of the misfortunes of the country at large, of yours individually, owing to the violent measures adopted by the powers at war, and finally of the several drafts you have drawn on me, for all which I am extremely sorry, and particularly of your confidence of drawing me into the common ruin. You have calculated on too much complaisance on my behalf, even admitting my means were adequate to your object, and after a mature consideration of the present state of affairs, and prospect of duration; of the statement you have made of your business ; the deficiency and little prospect of your being able to redeem your losses ; and, finally, that even by advancing a share of the sum you require, without the whole, would not alleviate your situation, I have taken the determination not to accept your drafts. This resolution is founded principally on the present state of non-communication and annihilation of all commerce, and it was one of the articles

of our convention, that " no bills are to be drawn on each other without funds in hand." In consequence of what is said heretofore, I shall consider all our concerns at an end, and beg you will cease all exertions in favour of my commercial establishment." By an endorsement on the letter, it appears to have been received on the 18th of *August*, 1808. The letters from *Eakin* contained advices of bills which he had drawn on *Sherburne*, several of which were in favour of the plaintiffs.

The defendants produced in evidence an account, entitled as follows, " Messrs. *Sherburne & Eakin*, in account current with *Jacob* and *Thomas Walden*," in the hand writing of the plaintiff *T. Walden*, in which the defendants were charged, on the 1st of *February*, 1817, with a balance of 4,405 dollars, 20 cents, and were credited with the sum of 663 dollars, 37 cents, on the 28th of *December*, 1811. There were also other credits, as well as charges, arising subsequently to the account rendered to *Eakin*, and not included therein. The plaintiffs objected to the admission of the credit of 663 dollars, 37 cents, on the ground that a suit had been brought by *Sherburne* alone, against the plaintiffs, for that item, and was still pending; but the judge admitted the defendants to the benefit of the credit for that sum.

It appeared that some of the bills, mentioned in the account, drawn by *Eakin* in favour of the plaintiffs, upon *Sherburne*, were given in payment of money advanced by the plaintiffs to *Eakin*. The counsel for the defendants objected to the allowance of the damages claimed in the account current, on the bills returned under protest, on the ground that the plaintiffs, under the circumstances, were not entitled to damages, and, if they were, they could not recover them under any count in the declaration. The judge admitted the objection, but gave leave to the plaintiffs to strike out the bills, and the monies paid on account of them, from both sides of the account current.

The plaintiffs, also, produced in evidence, a waste book, which was proved to be in the hand writing of *Eakin*, and a number of entries were read from it, both by the plaintiffs and defendants. It appeared that the plaintiff, *T. Walden*.

NEW-YORK, had become surety with *Eakin*, in several custom house bonds
October, 1818. given for duties on goods imported, and which, when they
WALDEN      fell due, were taken up by *Eakin*, but that the plaintiffs had
v.
SHERBURNE.  lent and advanced him money for this purpose ; and it was
contended that the money thus lent was not recoverable in
this action ; but the judge ruled otherwise, provided the jury
should find the existence of a partnership.   A verdict was
taken for the plaintiffs, by consent, for 5,000 dollars, subject
to the opinion of the court on a case, and the damages were
to be increased or diminished as the court should direct.

*Griffin*, for the plaintiffs.   1.  There was a general part-
nership, between the defendants, when the demand of the
plaintiffs arose, in 1806.   To make *Sherburne* liable as a
partner, it is sufficient to show that he shared in the profits
of the joint concern.   Whether the profits be more or less,
can make no difference.   The evidence of the fact of ge-
neral partnership arises from the articles of partnership,
from general reputation, and from entries in the books of
account.

The limitation in the articles, of the liability of the par-
ties to the amount of profits, though it may be conformable
to the law of *France*, is of no force here, except between the
parties themselves.   An *American* house of trade must be
governed by the laws of this country.   (*Robinson* v. *Bland*,
1 *Wm. Bl. Rep.* 234. 256.   *Smith* v. *Smith*, 2 *Johns. Rep.*
235.   *Thompson* v. *Ketcham*, 4 *Johns. Rep.* 285.   8 *Johns.
Rep.* 189.)

2.  As regards third persons dealing with a partnership,
it makes no difference, as to the responsibility of the part-
ners, whether the partnership is general or limited ;  or
whether the partner who receives the money or property
applies it to the partnership account or not.   It is enough
that the transaction is in the name of the partnership, and
that the advance is made on its *credit ;* unless some collusion
is shown between the plaintiffs and the partner.   One part-
ner may bind the firm, without its consent, by a simple con-
tract, *not relating to the partnership*, if he deal in the name
of the partnership, with a person who has no notice that
he is dealing on his separate account.   (*Montagu on Part-*

*nerships*, 23.   8 *Vesey*, 540.   7 *East*, 210.   13 *East*, 175.
1 *Campbell N. P. Rep.* 185.)

Again ; there was a general existing partnership between the defendant and *E.* in and prior to 1806, and there is no other evidence of its dissolution than the letters between the parties.   These may be sufficient for that purpose, as between them ; but, in regard to third persons, such a private agreement can have no effect.   There should be either a personal notice to persons dealing with the firm, or a public notice in the gazette.

Then, as to the proof of the advances made by the plaintiffs to the firm.   The account current rendered by them, and produced by the defendants, is sufficient evidence.   It contains all the plaintiffs' claim, and by introducing it as evidence, the defendants, *prima facie*, have admitted the justness of the charges.   They are concluded by it, unless they wholly disprove the items.   The plaintiffs, therefore, must recover the balance as stated.   (*Randle* v. *Blackburn*, 5 *Taunt. Rep.* 245.   *Phillips' Law of Ev.* 79.)

3. The letters from *Eakin* to *Sherburne* were not admissible evidence.   By reading the letters from *S.* to *E.* the plaintiffs did not sanction or admit the answers of *E.* to *S.* nor are they to be concluded by them.   This, however, is not a material point, except so far as the defendants may rely on the correspondence, as evidence that there was no partnership.   If, in that view, it should become necessary to examine it, it will appear to be a most extraordinary and mysterious correspondence ; intended, in consequence of the difficulties attending a commercial intercourse with *Europe*, to veil the true situation of the parties.

4. It may be objected, that the declarations of *E.* were not admissible evidence to charge *S.*   It is not necessary to combat this objection, as it may be thought to impeach the case of *Whitney* v. *Ferris ;* (10 *Johns. Rep.* 66.) though Lord *Ellenborough*, in *Evans* v. *Drummond*, (4 *Esp. N. P. Rep.* 89.) did admit the declarations of *C.*, with whom the plaintiff dealt, to charge *D.* as his secret partner.   Thus much, however, must be conceded, that, having first established the connection in business or partnership between the parties, the declarations of one of them is evidence to bind both.

5. It will be said, that the money lent *E.* to take up the custom-house bonds for which *T. W.*, one of the plaintiffs, had become surety, is not recoverable ; and the case of *Tom* v. *Goodrich* and others, (2 *Johns. Rep.* 213.) will be relied on as an authority in support of this objection. But that case proceeds on the strict technical ground of a payment by a *surety* of a *bond* executed by one of the partners and himself. This case is clearly distinguishable. The plaintiffs did not take up the bond, or pay the money, to relieve themselves as sureties. *E.* himself took up the bond, and the bond was introduced merely to show that he applied the money, lent by the plaintiffs, to the use of the partnership ; it being admitted that the goods imported, for the duties on which the bond was given, were for the account of the partnership.

*S. Jones*, jun., contra. There was no partnership between *E. & S.* after the 30th of *September*, 1806. There had been a limited partnership between them in *France*, where they resided, which being dissolved, they agreed to establish two distinct and wholly independent houses, one in *France*, and the other in the *United States*, for the sole object of transacting *commission* business. In regard to every other business, each was at perfect liberty to carry it on as he pleased, for his own individual benefit. They were partners only in cases of consignment from one to the other, in the profits arising from the sales. It is like the case of two persons purchasing goods and selling them on their joint account, where the joint concern or partnership is limited to that particular object. A special, or limited partnership, may exist, and the responsibility of the parties is confined to their contracts in regard to such particular business.(a) (*Lansing* v. *Gaine & Ten Eyck*, 2 *Johns. Rep.* 300. *Livingston* v. *Roosevelt*, 4 *Johns. Rep.* 256. *Dubois* v. *Roosevelt, ib.* note. *Watson on Partners*, 54. 184.) If any doubt exists on this point, it is removed by the conduct of the parties. *S.* continued to do business in *France*, in all other respects, on his own separate account. The correspond-

(a) Vide *Wallet* v. *Chambers, Cowp.* 814. per Lord *Mansfield.*

ence between *S. & E.* contains no evidence of a general partnership. They had no motive for concealment, or to wrap their concerns in mystery. One of the letters, *December* 3d, 1807, is confidential, sent by a friend, and, therefore, not exposed to accident. The mere declarations, or acts, of one person, are no evidence to charge another, or to show a partnership. (10 *Johns. Rep.* 66.) The court, it is true, in *Whitney and another* v. *Sterling and others,* (14 *Johns. Rep.* 215.) allowed evidence of general reputation, connected with corroborating circumstances, to be evidence, *prima facie,* that *B.* was a partner of *H. S. & Co.*; but there notice had been given to produce the articles of copartnership, which the defendants refused to do. Where articles of copartnership are, in fact, produced, general reputation can avail nothing.

In *Livingston* v. *Roosevelt,* (4 *Johns. Rep.* 278.) *Kent,* Ch. J. observed, that " where the business of a partnership is thus defined, and publicly declared, and the company do not depart from that particular business, nor appear to the world in any other light than the one thus exhibited, one of the partners cannot make a valid partnership engagement on any other than a partnership account. There must be some authority beyond the mere circumstance of partnership to make such a contract binding. Were it otherwise, it would be idle, and worse than idle, to talk of limited partnerships, in any matter or concern whatever." The plaintiffs have been aware of the necessity of showing, not only that the advance was made to one of the partners, but that the money was applied to the use of the copartnership.

The letter of the 14th of *October,* 1806, from *S.* to the plaintiffs, gave them notice that the partnership, before existing between *S. & E.,* was dissolved, and referred the plaintiffs to *E.,* who was coming to *New-York* to establish himself there. The dissolution of the former partnership, and each party establishing, a distinct house of trade in their separate names, is evidence that the former partnership did not exist or continue. If they intended to be partners, why not continue their former firm? By the new agreement, all shipments to *France,* by *E.,* were to be on his own account

and risk ; and all shipments by *S.*, to the *United States*, on his own account and risk. Each was to bear the loss, if any, on their respective shipments. They were to be jointly concerned in the profits only, if any should arise, from sales. The plaintiffs were well acquainted with the business and transactions of *E.*, who traded in various ways not comprehended in the articles of agreement between him and *S.* The plaintiffs, then, were bound to show that all their advances to *E.* were for the special object of the partnership, and were applied to that object.

The special partnership, if any existed, was finally terminated by the letter of *S.* of the 30th of *May*, 1808, to *E.*, and received by him the 18th of *August* following. As the plaintiffs have not given credit to *S.*, as a partner, since the first notice of the dissolution, they can have no claim against him for advances made since he ceased to have any interest in the profits of *E.'s* business, even without notice of that fact.

But it is said, that the account current of 1807, rendered by the plaintiffs against *S.* & *E.*, and produced by *S.*, is conclusive against him ; but it was a mere copy of an account rendered to *E.* Besides, the admission of one partner, after a dissolution of the partnership, cannot bind his copartner. In *Hackley* v. *Patrick*, (3 *Johns. Rep.* 536.) the court decided that the acknowledgment of the balance of an account by one partner, who was authorized, on the dissolution, to settle the accounts of the partnership, did not bind his copartner. Now, the acknowledgment endorsed on the account, by *E.*, was subsequent to the dissolution.

Again ; it is said that the entries in the waste book of *E.* are evidence ; but they can amount to no more than his private declarations. That was the private book of *E.*, and contained entries of his business, generally, subsequent to, as well as during, his connection with *S.*

Again ; the moneys charged by the plaintiffs as advanced to *E.*, to take up the custom house bonds on which they were sureties for *E.*, cannot be recovered against *S.*, admitting him to be a partner. The case of *Tom* v. *Goodrich*, (2 *Johns. Rep.* 213.) is decisive on this point. The bond

being executed by *E.* alone, was his private debt, for which
*S.* is not liable.

As to the *interest* on the account, *S.*, if liable at all for
the debt, ought not to pay interest, until after the de-
mand made of him, in *February*, 1817.

*T. A. Emmet*, in reply.  By their agreement, *S.* and *E.*
were to share the profits on all goods reciprocally shipped
for sale ; and all on goods consigned, they were to share in
the commissions.  The dissolution of the former general
partnership was merely nominal, and was obviously intend-
ed to protect the property of the concern from *British* cap-
ture.  The letter of *S.* to the plaintiffs, in which he an-
nounces the dissolution, and refers them to *E.*, made the latter
an agent to state the nature and extent of the connexion.

Again ; the advances by *S.* to *E.* constituted a partnership
concern.  *S.* could control all the *profits* of the adventures.
Partnerships carried on here are not to be governed by the
laws of a foreign country, or the peculiar laws of *France.*
The letter of *S.* of the 30th of *May*, 1808, in which he
refuses to accept bills, refers to an article of their agree-
ment not found in that of *September*, 1806.  The language
of the correspondence between *S.* and *E.* is not that of per-
sons acting separately and distinctly, and writing to each
other ; but is that of one person writing to another, about
matters in which they have a common interest and concern.

Reputation is admissible as to partnership ; and where
the parties live in the same place, it is strong evidence ;
but reputation connected with other circumstances is suffi-
cient evidence.  There does not appear any intention on
the part of *S.* to conceal the fact of his being a partner of
*E.* as it regarded creditors, but merely for the sake of guard-
ing against the effect of *British* capture.  His letter au-
thorized *E.* to make full disclosures and declarations, as to
their connection, to all persons with whom he wished to
transact business.  In his letter, also, of *April*, 1808, in
which he speaks of the transaction with *Bell & Co.*, he
says, that in case the debt is paid, *E.* should be credited *his
share of the profits.*

In *Wood and others* v. *Braddick*, (1  *Taunt. Rep.* 104.)

NEW-YORK, the court of C. B. in *England*, decided, that the admission
October, 1818. made by one of two partners, after a dissolution of the co-
WALDEN partnership, as to what took place during the partnership,
v. was competent evidence to charge the other partner.
SHERBURNE, *Heath*, J., said, that the dissolution operated only as to the
*future*, not as to things past, with respect to which the part-
nership continues, and always must continue.(*a*)

This is, undoubtedly, the true principle, though it is true,
that this court, in *Hackley* v. *Patrick*, thought otherwise.

The case of *Tom* v. *Goodrich* turned on the technical rule
of law as to sealed instruments, and as to principal and
surety; but the plaintiffs, as partners, were not sureties of
*E. T. W.* signed one bond, and *J. W.* another.

SPENCER, J., delivered the opinion of the court. The ver-
dict being taken by consent, subject to the opinion of the
court, we must draw such conclusions from the evidence, as
we think the jury ought to have drawn. The principal in-
quiry is, whether the defendants were general partners, in
consequence of the agreement between them, of the 30th of
*September*, 1806. Regarding the whole of that instru-
ment, the circumstances of the times, and the conduct of
the parties under it, I feel no hesitation in saying they were
general partners. It appears, by the recital to the agree-
ment, that the defendants had been partners in a commer-
cial house at *Nantz*, in *France*, from *May*, 1804. That part-
nership they agreed to dissolve; and for the purpose of pro-
moting the general as well as individual interest of each
party, they further agreed to establish a commercial house
in *New-York*. It is to be observed, that both the defend-
ants were *American* citizens, and the articles under con-
sideration contemplate that *Eakin* was to reside at *New-
York*, and *Sherburne* in *France*.

The first article of the agreement states, that the princi-
pal object of their respective establishments was intended
to procure consignments on commission from the *United
States*, and they pledged their honour to use their best endea-
vours in the attainment of that object.

(*a*) Vide *Simpson* v. *Geddes*, 2 *Bay's Rep.* 533. S. P.

By the second article, *Sherburne* engages to ship, from time to time, such goods as may be deemed profitable for sale in the *United States*, directed to *Eakin*, for account of himself, for such *American* citizens as he may point out.

By the third article, *Eakin* engages to convert all such amounts, likewise any *sum he may be able to command, arising from association, loan, or credit, into reasonable advances on goods consigned for sale,* to the house of *Sherburne ; Eakin* taking the precaution of insuring.

By the fourth article, all shipments of goods made by order of *Eakin*, shall be for his account and risk, but one third of the net profits arising from the sales of the goods, after deducting two and a half per cent. commissions, was to be carried to the business credit.

The fifth article, provides that all consignments of goods received from the *United States*, whether from shipments made directly from *Eakin*, or from his friends in consequence of his influence and exertions or orders, *Sherburne* agrees to account with *Eakin* for one third of the net commissions arising from such consignments ; and it is declared to be understood that this condition should be made reciprocal. The sixth article stipulates, that when a shipment of goods is deemed prudent to be made by *Eakin*, on his own account, consigned to *Sherburne*, a mutual exchange is to take place ; and the article proceeds to arrange how the net profits and commissions are to be divided. *Sherburne*, in such case, is to receive one third of the net profits, and *Eakin*, one third of the net commissions. They also agree, that if losses should arise on such adventures, they are to be deducted from the amount of the profits made in the year ; and they agree not to be answerable for the losses on shipments, beyond the profits made in the year. These are all the stipulations material to this inquiry.

It is very manifest, from the whole agreement, that the defendants meant to keep out of sight, the fact, that there was to be a commercial establishment in which both were interested, in *France ;* that all goods going to and from *France*, were to appear to be owned by *Eakin*, who was domiciled here, to avoid the risk of *British* captures ; but in all the adventures, whether from *America* or *France*, both

NEW-YORK, of them were to have the stipulated profits and commissions,
October, 1818. in a manner promoting the reciprocal interests of each.
WALDEN   No principle is better established, than that every person is
SHERBURNE. to be deemed in partnership, if he is interested in the profits
of a trade, and if the advantages which he derives from the
trade, are casual and indefinite, depending on the accidents
of trade. (2 *Wm. Bl. Rep.* 947. 998.) To constitute a
partnership, a community of profits and loss is essential ; the
shares must be joint, though it is not necessary they should
be equal. (1 *H. Bl.* 37.)

By the 3d article of the agreement, it was contemplated
by both the defendants, that *Eakin* was to exert his credit
in making advances on goods consigned to the house of
*Sherburne*, for sale, and both of them were to participate in
the profits and commissions. This puts it beyond all doubt,
not only that the defendants were partners, but that *Eakin*
had a right to borrow money, to advance the interests of
the firm.

It has been contended, that the defendants were limited,
not general partners ; and that, therefore, *Sherburne* was not
bound for the advances made to *Eakin*, as it did not appear
that they were made to promote the direct and specified
objects of the partnership. All partnerships in one sense,
are limited. They have particular branches of trade in view ;
none embrace all the varieties of trade. All that is requi-
site to render a debt contracted by one of the partners
binding and obligatory on the others, is that the debt relate
to the partnership. The authority delegated by one part-
ner to another, is to act in the course of their particular
trade or line of business ; and in such transactions, strangers
have a right to act on the credit of the partnership fund.
It is not necessary that the money lent, or credit given,
should appear to have been actually used for the benefit of
the partnership ; third persons have no concern with that.
This principle is strongly exemplified in the case of *Bond* v.
*Gibson* and *Jephson ;* (1 *Camp. N. P. Rep.* 185. ;) there one of
the partners, with the intention of cheating the other, went to
the plaintiff's shop and purchased a great number of articles
which might be used in the partnership business, and in-
stantly converted them to his separate use. It was a fair sale

in the ordinary course of business. Lord *Ellenborough* held, that unless the seller is guilty of collusion, a sale to one partner, with whatever view the goods may be bought, and to whatever purposes they may be applied, is a sale to the partnership.

The letters from *Sherburne* to *Eakin* by no means tend to disprove the fact of the existence of a partnership. Considering the necessity for caution, lest their correspondence might be intercepted, the letters are not incompatible with a partnership. Indeed, they seem to me to take an interest in the business which *Eakin* was doing, indicative of a concern in it; and *Eakin's* letters convey the same idea; although I do not consider these letters of any material importance, for, in my judgment, the plaintiffs' case does not require them.

With regard to the stipulation in the articles of agreement, that the losses on shipments should be deducted from the profits of the year, and that the partner not making the shipment, should be no further answerable ; this was a valid agreement as between the partners, but cannot affect any person dealing with the partnership. If the transaction was in the ordinary course of business, and attached on the partners, they are answerable to the whole extent of their fortunes.

It has been objected, that moneys lent to pay the custom-house bonds, are not chargeable upon the partnership, inasmuch as one of the plaintiffs was a surety in those bonds, for *Eakin* only. The case of *Tom* v. *Goodrich and others*, (2 *Johns. Rep.* 213.) has been cited and relied on, in support of this objection. That case would have applied with decisive effect, had the custom house bonds been paid by the plaintiffs ; but they do not make the bonds the ground of their demands. They were paid by *Eakin*, with money lent and advanced by the plaintiffs. This money was applied by *Eakin*, one of the partners, to pay a partnership charge. Had the money been advanced for the same purpose, by any other person, no doubt could have existed, as to the liability of the defendants ; and the plaintiffs did not advance the money to relieve themselves from the bonds,

or because they had become chargeable, but it was money lent in the course of business.   The objection is untenable.

It has been strongly insisted, that the plaintiffs did not produce sufficient evidence to prove the items of their account.   On the 15th of *September*, 1808, *Eakin*, by his certificate, endorsed on an account current, made out by the plaintiffs, and charged against him alone, admitted a balance to be due the plaintiffs, for 5,802 dollars, 54 cents ; which he further certifies to have been contracted since his connection with *Sherburne*.   This balance was admitted, after the dissolution of the partnership, which took place on the 18th of *August*, 1808; for, on that day, *Eakin* received *Sherburne's* letter dissolving the connection.   According to the decision of this court, in *Hackley* v. *Patrick and another*, (*3 Johns. Rep.* 536.) one partner cannot, after a dissolution, bind his copartner by acknowledging an account, any more than he can give a promissory note to bind him.   It seems that the court of Common Pleas, in *England*, have held otherwise ; (1 *Taunt.* 104.) but I believe there is more safety in the rule of this Court, than in a contrary one.

It appears to me, that the proof of the account is fully made out. The waste book, in the hand writing of *Eakin*, was proved, and given in evidence.   This I take to be an original book of entries made at the time the transactions took place ; and this book contained credits for all the plaintiff's accounts.   The existence of the partnership being established, it follows, that an admission of the account, by one of the partners, during the continuance of the partnership, is competent proof.   Besides, the case states, that the plaintiff's account against *Eakin* was proved, and read in evidence.   Now this account is precisely the account against both defendants, and if proved, the proof avails against both.

Again ; the defendant, *Sherburne*, to gain a deduction from the plaintiff's account, produced the account himself, and by doing so, he made it evidence.   He might, indeed, contradict, or disprove it, but not doing so, it was evidence in the cause, to the jury.   (5 *Taunt.* 245.)

The only remaining question is as to the interest.   We have uniformly decided, that after an account has been li-

quidated, it carries interest; and that an account is to be considered liquidated after it has been rendered, if objections are not made to it. In the present case the account was rendered to one of the defendants on the 15th of *September*, 1808, and not objected to; indeed, it was admitted. From that period the plaintiffs are entitled to interest.

NEW-YORK,
October, 1818.

Judgment for the plaintiffs accordingly.